35 C.C.P.A. (Patents)

## APPLICATION OF PELZER.
### Patent Appeal No. 5452.

Court of Customs and Patent Appeals.
June 1, 1948.

Pennie, Edmonds, Morton and Barrows, of New York City (Louis D. Forward, of New York City, and Clarence M. Fisher, of Washington, D. C., of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (H. S. Miller, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and HATFIELD and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the rejection by the Primary Examiner of four claims numbered, respectively, 1, 2, 5, and 6 in appellant's application for patent relating to the manufacture of gasoline. Three claims stand allowed.

In the brief for appellant before us it is stated, in substance, that "the ruling with respect to claim 1 will be determinative with respect to claims 2 and 5," and that, for the purposes of this appeal, "it should be sufficient to consider only claims 1 and 6." Claims 1 and 6 read as follows:

"1. In the manufacture of gasoline from higher boiling petroleum oils, the improvement which comprises mixing a small proportion of a finely divided argillaceous material with a high boiling petroleum distillate stock, heating this mixture to and at a high cracking temperature approximating 950°–1100°F. while flowing as a stream at a velocity sufficient to maintain said material in suspension in said stock for a period of time sufficient to convert a substantial part of said stock into hydrocarbons within the gasoline boiling range, thereafter separating the resulting hot products into a composite vapor fraction including the gasoline hydrocarbons and a substantially dry cokey residual material comprising the residue of substantially all of said argillaceous material, and recovering gasoline from said composite vapor fraction.

"6. In the manufacture of gasoline from higher boiling petroleum oils, the improvement which comprises mixing with a high boiling petroleum distillate stock a small amount of a finely divided synthetic active catalyst comprising silica and alumina, heating this mixture to and at a temperature approximating 950°F. while flowing as a stream at a velocity sufficient to maintain said catalyst in suspension in said stock for a period of time sufficient to convert a substantial part of said stock into hydrocarbons within the gasoline boiling range, thereafter in a coke separating zone maintained at a temperature not substantially exceeding 825°F. separating the hot products of said heating into a composite vapor fraction including the gasoline hydrocarbons and a substantially dry cokey residual material comprising the residue of substantially all of said catalyst, and recovering gasoline from said composite vapor fraction."

The following patents were cited as references:

| | | | |
|---|---|---|---|
| Stratford | 2,091,892 | Aug. 31, | 1937 |
| Houdry | 2,141,185 | Dec. 27, | 1938 |
| deFlorez | 2,323,206 | June 29, | 1943 |

All the appealed claims are process claims and a drawing explained in the specification of the application discloses an apparatus with which the process may be carried out. The references also embrace drawings, the

apparatus disclosed by the deFlorez patent resembling that disclosed by appellant in a number of respects.

As may be visualized from the claims hereinbefore quoted, appellant's process embraces mixing a small proportion of a finely divided synthetic active catalyst made of silica and alumina with a high boiling petroleum distillate stock. The mixture while flowing as a stream at a described velocity is heated to and at a high cracking temperature approximating 950°–1100°F. Thereafter the hot products are separated (claim 6, supra, states in a coke separating zone maintained at a temperature not substantially exceeding 825°F.) into a composite vapor fraction including the gasoline hydrocarbons and a substantially dry cokey residual material comprising the residue of substantially all of the catalysts, and finally recovering the gasoline from the vapor fraction.

In the Stratford patent oils are treated for cracking purposes in the presence of clay, a slurry of clay in oil being fed from a tank through one pipe into another pipe where it mixes with a high boiling petroleum distillate stock. The mixture is passed through another coil in which the cracking operation is carried out at a temperature "from about 750°F. to 1,000°F., although higher cracking temperatures may also be used." The mixture of cracked hydrocarbons and clay passes from the cracking coil into a soaking drum. Tar is obtained as a residual liquid product, while the naptha and gas oil are passed as an overhead vapor product into a fractionating zone in which the gas oil is separated from the naptha.

The Houdry patent, apparently, was cited solely for its disclosure of the use, in the reforming of naptha, of a catalyst which "is essentially a blend of silica and alumina with as little extraneous material as possible," and it may be said at this point that it is not questioned by appellant that silica-alumina materials have long been recognized in the art as cracking catalysts, and the applicability of Houdry as a reference on that particular feature is not in issue.

In the deFlorez patent petroleum distillate stock is taken from a fractionating tower and pumped through a pipe into a heating coil contained within a heater. There a slurry containing a solid catalytic material is admitted to the coil and mixed with the oil. The mixture is heated to and at a temperature of about 1000° in the heater. After the heating the hot products are separated in a coke separating chamber into a composite vapor fraction including gasoline hydrocarbons and a substantially dry cokey residual material. The vapor fraction passes out through a pipe. Gasoline is recovered from the composite vapor fraction.

The examiner discussed the appealed claims separately in his statement following the appeal to the board and rejected each of them upon the deFlorez patent and also on the Stratford patent. Both the examiner and the board seem to have considered the deFlorez patent the better reference and the board affirmed the rejection on it, stating that the Stratford patent was regarded as cumulative.

It is conceded, of course, that appellant has made an invention. That is evidenced by the allowance of three claims. Those claims obviously must have been found by the examiner who allowed them distinguishable in a patentable sense from the prior art, but this was not found to be true as to the appealed claims, and, as is pointed out in the brief of the Solicitor for the Patent Office, in effect, appellant's elaborate brief before us fails to specify limitations in the appealed claims which do distinguish them in a patentable sense from the prior art.

In discussing claim 1, for example, appellant refers to limitations which, while they may be present in his process, are not defined in that claim. So far as the limitations or steps actually defined in that claim are concerned, we think it was correctly held that they are not patentable over the references.

It does not seem to be questioned by the appellant that the first step of claim 1, that is "mixing a small proportion of a finely divided argillaceous material with a high boiling petroleum distillate stock" is taught by deFlorez.

With respect to the second step, that is the heating of the mixture, it appears that the deFlorez patent defines alternative methods of operation. In one of those no

catalyst comes into contact outside the re-action chamber with the oil to be cracked. This, apparently, would not meet the limitation in claim 1, but in another method, as is conceded by appellant, the slurry of catalyst in its carrier liquid is introduced to the heating coil and this does meet the limitation, or at least claim 1 is not deemed to be patentable over that disclosure.

The degree of temperature stated in claim 1 specifies 950°–1100°F., while de-Florez specifies "about 1000°." Stratford gives a range "from about 750°F. to 1000°F." or higher.

With respect to the time of heating, or "heating rates," claim 1 does not specify any particular rate, but merely requires heating "for a period of time sufficient to convert a substantial part of said stock into hydrocarbons within the gasoline boiling range." There is nothing in this general statement which distinguishes this step from that of deFlorez or from that defined by Stratford.

The step of separating the hot products into a composite vapor fraction including the gasoline hydrocarbons and a substantially dry cokey residual material, defined in the claim, obviously is shown by the deFlorez patent, the separation taking place after the conversion by heating, and the residual material being a "solid coke-like material."

The sixth and last step—"recovering gasoline from said composite vapor fraction"—is disclosed by deFlorez as "fractionating the vapors and condensate * * * to form gasoline * * *."

The only difference between claim 1 and claim 6 that is emphasized by appellant is that the latter specifies maintaining the temperature in the coke separating zone at "not substantially exceeding 825°F."

As has been indicated, the Stratford patent teaches that the temperature at which the cracking is carried out may vary from about 750° to 1000°F. or higher. There is no specific teaching, however, as to the degree of temperature maintained in the separator wherein the naptha and gas oil are separated from the tar, nor do we find any specific degree taught by deFlorez, but we are not persuaded that "not substantially. exceeding 825°F." presents a critical standard.

The examiner held that it "appears to be merely an optimum temperature and not a critical one."

The board's discussion of claim 6 reads: "As to claim 6, it is urged that the 825°F. temperature is a critical limitation as shown by examples 1 and 2. We do not regard the showing by these examples as establishing that there is a sharp demarcation between the temperature which gives lessened gasoline production when a high temperature prevails in receptacle 14 and for enhanced gasoline production when a lower temperature prevails. The transition may well be gradual, as is implied by the wording of the claim—'not substantially exceeding 825°F.' Moreover, it would appear to be well within the skill of the routine investigator in testing the various temperatures that could prevail in deFlorez's chamber 28 to notice that the gasoline yields varied at the temperatures involved."

In arguing the question along with the other question hereinbefore discussed the brief for appellant urges that appellant has obtained results superior to the results obtainable by the prior art processes. That may be true. It is possible that the features responsible for such results may be found in the allowed claims, but whatever the situation in that regard the appealed claims must be tested in the light of the prior art by the steps defined in the claims.

We are not convinced that the board erred in its holding and its decision is affirmed.

Affirmed.

By reason of illness, O'CONNELL, Judge, was not present at the argument of this case and did not participate in the decision.